UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WILLIAM GLENN KIRKLAND                    CIVIL ACTION

VERSUS                                    NO.  04-0910 C/W 04-0911
                                          AND 04-0933

MARRIOTT INTERNATIONAL INC., ET AL.       SECTION "R" (1)

**ORDER**

Defendants have moved to exclude the testimony of plaintiff's proposed expert David Luxemburg and to strike the expert testimony of both Luxemburg and John Williams. For the following reasons, the Court DENIES both motions.

**I.    BACKGROUND**

Plaintiffs allege that on March 10, 2003, they were in an elevator at the New Orleans Marriott when the elevator suddenly fell from the ninth floor to the basement. They sued Marriott International, Schindler Elevator Company and Zurich Insurance Company for damages based on the injuries they suffered in this accident. Plaintiffs allege that the elevator fell because it

was negligently maintained.  Defendants apparently plan to argue at trial that the elevator fell because it was loaded beyond its capacity.

The Court initially scheduled trial in this matter for November 7, 2005.  On April 28, 2005, the Court ordered that all written reports of experts who may be witnesses for plaintiffs "shall be obtained and delivered to counsel for Defendant, as soon as possible, but in no event later than July 29, 2005." Defendants assert that plaintiffs did not deliver John Williams' expert report to them until August 16, 2005 and that plaintiffs did not deliver David Luxemburg's expert report to them until August 18, 2005.  They ask the Court to prohibit Williams and Luxemburg from testifying at trial for failure to meet the deadline set in the Court's Order of April 28, 2005.  Since defendants filed this motion, the trial in this case has been continued until August 21, 2006.

Defendants have also filed a *Daubert* motion that seeks to exclude Luxemburg's testimony because it will be unreliable and irrelevant.  They also ask the Court to find portions of his proposed testimony inadmissible under Federal Rule of Evidence 407.

## II.  DISCUSSION

2

**A.   Defendants' Motion to Strike**

Under Federal Rule of Civil Procedure 16(b), scheduling deadlines may be modified upon a showing of good cause.  FED. R. CIV. P. 16(b).  Trial courts have broad discretion to enforce or modify pretrial orders issued under Rule 16.  *Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir. 1990).  Defendant argues that failure to meet the deadlines set out in the scheduling order will prejudice their ability to prepare for trial and rebut the proposed testimony.  The Court rejects these arguments because the delays were not lengthy in the first place, and the trial has since been postponed by over nine months.  Further, plaintiffs have offered a reasonable explanation for their delays in furnishing the reports.  In the case of Williams' report, plaintiffs furnished the substance of the report to defendants' counsel on time.  As for Luxemburg, plaintiffs furnished his report on a timely basis, he was deposed, and only a supplement to the report was delivered following the Court's deadline.

For the foregoing reasons, the Court denies defendants' motion to strike plaintiffs proposed experts.

**B.   Defendants' *Daubert* Motion**

Defendants argue that David Luxemburg's expert testimony should be excluded because his testimony will be unreliable and irrelevant.  *See Daubert v. Merrell-Dow Pharmaceuticals*, 509 U.S.

579 (1993).  They also argue that his proposed testimony as to
repairs made on the elevator after the accident is inadmissible
under Rules 407 and 403 of the Federal Rules of Evidence.

1.   *Standard for Evaluating Daubert Claims*

Federal Rule of Evidence 702 gives the district court
considerable discretion to admit or exclude expert testimony.
*See General Electric Co. v. Joiner*, 522 U.S. 136, 138-39 (1997).
Rule 702 provides that an expert witness "qualified . . . by
knowledge, skill, experience, training or education," may testify
when scientific, technical or other specialized knowledge will
assist the trier of fact to understand the evidence or to
determine a fact in issue.  FED. R. EVID. 702.  For the testimony
to be admissible, Rule 702 requires that (1) the testimony be
based on sufficient facts or data, (2) the testimony be the
product of reliable principles and methods, and (3) the witness
apply the principles and methods reliably to the facts of the
case.  FED. R. EVID. 702.

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court
held that Rule 702 requires the district court to act as a
"gatekeeper" to ensure that "any and all scientific evidence
admitted is not only relevant, but reliable."  509 U.S. at 589;
*See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149
(1999)(clarifying that Daubert gatekeeping function applies to

4

all forms of expert testimony).  The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance.

First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence.  *See Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).  The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert*, 509 U.S. at 590.  The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id*.  In *Daubert*, the Supreme Court offered an illustrative, but not an exhaustive, list of factors that district courts may use in evaluating the reliability of expert testimony.  These factors include whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community.  *Id*. at 593-94.  In the later case of *Kumho Tire Co. v. Carmichael*, the Supreme Court emphasized that the *Daubert* analysis is a "flexible" one, and that "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's

particular expertise, and the subject of his testimony."  526
U.S. at 150.  The district court's responsibility is "to make
certain that an expert, whether basing testimony upon
professional studies or personal experience, employs in the
courtroom the same level of intellectual rigor that characterizes
the practice of an expert in the relevant field."  *Id.* at 152.

Second, the Court must determine whether the expert's
reasoning or methodology "fits" the facts of the case and whether
it will thereby assist the trier of fact to understand the
evidence, in other words, whether it is relevant.  *See Daubert,*
509 U.S. at 591.

> 2.   *Defendants' Arguments as to Reliability*

Defendants allege that Luxemburg's expertise is suspect, his
opinions are unsupported by his own work or the evidence in the
record, his methodology is illogical, his statements are
confusing and/or misleading, and that he is personally dishonest.
Defendants' motion uses a great deal of overheated language that
does not assist the analysis.

Luxemburg's qualifications as an expert in elevator safety
include nearly thirty years of experience working with elevators,
beginning with work as a technician in the Navy and extending to
ownership of Ver-Trans Elevator Company, a "multi-million dollar
independent Louisiana Elevator Company" that specifies,

supervises, maintains, constructs, tests and troubleshoots elevator systems.  (Joint Opp. to Def.'s Mot. to Exclude the Proposed Expert Test. of David Luxemburg, Ex. 1).  For seven years he was responsible for inspecting, maintaining, and adjusting all lift devices on Louisiana State University property.  (*Id*.).  Immediately before he joined Ver-Trans, Luxemburg worked for four years as a consultant for Elevator Testing Services, specializing in inspection, testing and consulting for the elevator industry.  (*Id*.).  He is certified by the National Association of Elevator Authorities as a qualified elevator inspector and is licensed by the State of Louisiana with a specialty in Elevators, Escalators, and Dumbwaiters.  (*Id*.).  He is also the Co-Owner of Elevator Experts, which specializes in "accident investigation, recreation, expert testimony, traffic analysis, specifications, and training."  (*Id*.).  He has served as an expert witness in forty-three other cases.  (*Id*.).

Defendants point to a deposition given by Luxemburg in a 2001 case as evidence that Luxemburg lacks the requisite knowledge of an elevator expert.  (Mot. to Exclude Proposed Expert Test. of David Luxemburg, Ex. B).  The portions of the deposition cited by defendants generally involve testimony in which Luxemburg states that he would be able to answer a question by referring to the text of the American National Standards

Institute ("ANSI") code but that he does not have a precise answer off the top of his head.  The Court does not find Luxemburg's testimony in 2001 relevant to the matter currently before the Court.  That Luxemburg has not published anything and does not sit on any ANSI committees does not disqualify him; defendants have pointed to no legal or industry norm that an expert be published or have an affiliation with any standards-setting group.

Defendants' claim that Luxemburg "shows no more than a layman's knowledge regarding elevators" is palpably belied by the record of his experience and his deposition testimony.  (*Id.* at 6).  Mischaracterizations such as this only undermine defendants' arguments.

As for the basis of the opinions Luxemburg will purportedly offer at trial, defendants portray his investigation as casual and indifferent to scientific methods.  Defendants repeatedly point out that Luxemburg admits to having done no tests,[1] no mathematical calculations, and no experiments and they assert that Luxemburg performed no fieldwork, no measurements, and no

---

[1]Defendants argue that Luxemburg should have performed tests on how the human body reacts to G-forces applied during an unexpected event, rather than an expected one, without explaining why this is relevant to the case.  (Mot. to Exclude Proposed Expert Test. of David Luxemburg, 6).  The Court does not see how these tests would be relevant to Luxemburg's proposed testimony, since he is not purported to be an expert on the extent of the injuries suffered by plaintiffs.

outside research to reach his conclusions.  (*Id.* at 7-8).  The
Advisory Committee note to Rule 702 explains that testimony from
experts whose reliability is based primarily on their personal
observations, professional experience, education, and training
may be admissible:

> Nothing in this amendment is intended to suggest that
> experience alone--or experience in conjunction with
> other knowledge, skill, training or education- may not
> provide sufficient foundation for expert testimony. To
> the contrary, the text of Rule 702 expressly
> contemplates that an expert may be qualified on the
> basis of experience.

FED. R. EVID. 702, Advisory Committee's Note.

In *Pipitone v. Biomatrix*, 288 F.3d 239 (5th Cir. 2002),
the Fifth Circuit held that when an expert's testimony is
based on specialized knowledge, training, experience, and
firsthand observation and is supported by solid evidence in
the scientific community, it is admissible.  288 F.3d at
247.  There, the court found that a specialist in infectious
diseases who believed that a contaminated syringe had
infected the plaintiff with salmonella was sufficiently
qualified to offer expert testimony.  *Id.* at 246.  The
expert in *Pipitone* reached his conclusions by reviewing the
available literature, applying his knowledge about the way
in which the salmonella organism functions, and ruling out
other explanations because they were highly improbable given

the facts of that plaintiff's case.  *Id*. at 245-50.  The
expert did not perform any experiments to test his beliefs,
and the court accepted his explanation that an
epidemiological study would not have been "necessary or
appropriate in a case such as this."  *Id*. at 246.

Similarly, in *St. Martin v. Mobil Exploration and
Producing*, 224 F.3d 402 (5th Cir. 2002), the Fifth Circuit
held that an ecologist's first-hand observations of a
flooded marsh and expertise in marshland ecology were
sufficiently reliable bases for his opinion to render his
expert testimony admissible.  224 F.3d at 406-07.  In both
*St. Martin* and *Pipitone*, the court pointed out that every
case does not merit rote application of the *Daubert* factors
- the court must calibrate its inquiry to the nature of the
facts and proposed testimony.  224 F.3d at 406; 288 F.3d at
245.

A case in the Eleventh Circuit, *Jones v. Otis Elevator*,
861 F.2d 655 (11th Cir. 1988), involves similar contentions
over the admissibility of expert testimony.  861 F.2d at
662.  In *Jones*, the plaintiff's elevator accident took place
in 1984 but her expert did not examine the elevator until
more than two years later.  *Id*. at 662.  The expert
concluded that the elevator's terminal stopping device had

10

not been recently inspected or properly set at the time of
plaintiff's accident.  *Id.*  He drew his conclusions from the
heavy layers of dust and dirt which had accumulated on the
device, an inspection of available maintenance reports, and
his belief that had a qualified person performed an
inspection of the device, the problems with the device would
have been corrected.  *Id*.  The court found that his
conclusions were admissible given his thirty years of
experience as an elevator engineer and his familiarity with
the elevator's stopping device.  *Id*. at 663.  The Court also
noted that "absolute certainty is not required" when experts
attempt to deduce explanations for earlier events based on
their later observations.  *Id*. at 662; *see also Kahn v.
United States*, 795 F. Supp. 473, 475 (D.D.C.
1992)(recounting testimony from an elevator expert in which
he testified that "the overwhelming probability" was that
someone had intentionally opened the doors on a
malfunctioning elevator).

　　Luxemburg reached his conclusions about the likely cause of
the accident by performing an inspection of the elevator in
question four months after the accident, reviewing the
depositions and statements of other individuals who may testify
as witnesses, reviewing the maintenance records of the elevator

and looking at the inspection tags on the elevator.  (Mot. to Exclude Proposed Expert Test. of David Luxemburg at Ex. C, pp. 29-33, 44, 56, 78-81, 93-94, 116-123).  Luxemburg posited two possible mechanical explanations for the elevator's sudden descent to the bottom of the elevator shaft: elevator overload or elevator brake failure.[2]  (Joint Opp. to Def.'s Mot. to Exclude the Proposed Expert Test. of David Luxemburg, Ex. 1).

There are apparently several aspects of an elevator system that work to keep the car from traveling down the elevator shaft inadvertently.  The first is the counterweight at the opposite end of the elevator cable, which weighs more than an empty car but less than a car that is fully occupied.  Here, Luxemburg estimated that the counterweight had a mass of 7,350 pounds (Mot. to Exclude Proposed Expert Test. of David Luxemburg at Ex. C, p.46).  The elevator car weighs 5,250 pounds unloaded, so some other force must be applied at all times to keep it from moving up the shaft (when it has fewer than 2,100 pounds of cargo) or down the shaft (when it has greater than 2,100 pounds of cargo). (*Id*. at 45).  When an elevator is moving, a motor powers the car and controls its movement.  When it is still, a braking system engages to hold the car in place.  If the total weight of the

---

[2] Luxemburg's report is not a model of clear writing, but his ideas can be understood when read in conjunction with the testimony he gave at his deposition.

12

cargo plus the car exceeds that of the counterweight, the brake keeps the elevator from moving down the shaft.  Here, the brake would be called upon to hold the elevator in place if there were more than 2,100 pounds of cargo in the car.

The elevator at issue was rated to a capacity of 3,000 pounds.  (*Id*. at 44).  According to Luxemburg, the brake on an elevator is required by ANSI standards to hold the elevator in place when the cargo weighs 125 percent of the car's rated capacity - 3,750 pounds in this case.  If the total cargo weighs more than this amount, the elevator is said to be overloaded.  If there is enough weight in the car to overcome the capacity of the brake, the brake will fail, and the car will fall.  However, Luxemburg testified that an elevator falling under these circumstances will descend at a rate fast enough to trip a governor device, an additional braking mechanism that engages during an emergency fall and is triggered once the elevator reaches a certain velocity.  The car would then come to a stop.

On the other hand, if the elevator is loaded past the weight of the counterweight, but not overloaded, and the brake malfunctions, Luxemburg testified that the elevator will slide down the shaft at a rate too slow to trip the governor (because of the friction caused by the malfunctioning brake), so the elevator will continue down the shaft until it reaches the

13

bottom.  (*Id*. at 112-13).

Luxemburg concluded that elevator overload was unlikely to be the cause of plaintiffs' accident because he did not think that enough people could fit into the elevator to overload it beyond the ANSI-required capacity of the brakes.  (Joint Opp. to Def.'s Mot. to Exclude the Proposed Expert Test. of David Luxemburg, Ex. 1).  Additionally, Luxemburg reasoned that if the elevator had been overloaded it would not have successfully left an earlier stop on the second floor and proceeded up the shaft.  (*Id*.).  He also reviewed the deposition testimony of witnesses to the accident, all but one of whom stated that no more than fifteen people were in the elevator at the time of the crash.  (Mot. to Exclude Proposed Expert Test. of David Luxemburg at Ex. C, p.29-30).  He testified that a safety device manufactured by the K-Tech Corporation that he observed atop the elevator should have prevented the elevator from running had it been overloaded.  (Mot. to Strike Expert Witnesses, Ex. B).  Even had the elevator been operating while sufficiently overloaded to cause a sudden descent, Luxemburg opined that the elevator would have fallen so fast that the safety governor on the elevator would have tripped and stopped the elevator, provided the brakes were not partially engaged as the elevator fell.  (*Id*.).

Because Luxemburg concluded that the elevator was most

14

probably not overloaded, he deduced that brake failure was the
likely reason for the fall. (*Id*.).  His conclusion was
buttressed by his review of elevator maintenance records, which
indicated to him that the brakes had not been properly inspected
or tested according to ANSI standards in 2000 and that a
considerable amount of work was performed on the elevator's
brakes following the accident. (*Id*.; Mot. to Exclude Proposed
Expert Test. of David Luxemburg at Ex. C, p.79).  In summary,
Luxemburg's opinion is that there were not enough people in the
elevator to overload the ANSI-rated capacity of the brakes; thus,
he opines that had the brakes been working properly, they would
have held the elevator in place and prevented the fall.  The
elevator fell, so the most probable cause, in his opinion, was
brake failure.  Defendants have not challenged his assumptions or
conclusions with any specificity.

Luxemburg's opinion is based on his efforts to gather the
facts about the accident from the available physical evidence and
testimony and his evaluation of those facts on the basis of his
extensive experience designing, inspecting, and maintaining
elevators.  Defendants inaccurately state that the only basis for
Luxemburg's opinion is that brake work was performed on the
elevator in May 2003. (*Id*. at 8).  Luxemburg explained in his
deposition that the May 2003 maintenance report only buttresses

15

his conclusions, it is not the sole basis for them.  (*Id.* at Ex. C pp. 78-80, 113).

Defendants allege that Luxemburg cannot explain facts that do not fit with his theory because he was unable to say why there were no records of subsequent brake failure following the accident.  This does not accurately characterize Luxemburg's testimony.  Luxemburg explained that brake failure could be an intermittent problem, such that there might not be additional reported failures of the brake following the accident.  (*Id.* at Ex. C, p. 185).

Defendants allege that Luxemburg twice attempted to deceive them in his deposition.  First, they allege that he waited until the end of the deposition to bring up the role the K-Tech safety device might have played in the accident and then offered confusing explanations of why information as to his opinions about the device were not included in the report he produced before the deposition.  Luxemburg's answers on this point are somewhat vague - it is unclear who signed his report or why it did not contain this information.  However, defendants will have had the supplemental report for one year before the trial and can re-depose Luxemburg on this topic if they feel it is necessary. That Luxemburg provided defendants with a brochure explaining the device at his deposition does not support the assertion that "the

16

potential for error in his work is overwhelming." (*Id.* at 11).

Defendants also allege that Luxemburg and Ricky Gonzalez, who previously serviced and maintained the elevators at the hotel, disagree about whether Gonzalez told Luxemburg that the K-Tech device never worked properly. (*Id*. at 11 & Ex. E) From this, defendants conclude that "[o]bviously, Luxemburg is not reliable." (*Id.*). The Court finds such conclusions about the credibility of witnesses best left to the trier of fact.

In sum, none of defendants' attacks on Luxemburg's methods or conclusions is sufficient to exclude his testimony on the basis that it is unreliable. In fact, the portions of his deposition they attack, when read in context, tend to show that Luxemburg's analysis was based on consideration of the available evidence guided by his considerable experience with elevators and their safety mechanisms.

### 3. *Defendants' Arguments as to Relevance*

Defendants assert that Luxemburg's deposition was so vague and non-committal as to his opinions about the accident that his testimony could not be helpful at trial. The Court has reviewed the deposition transcript and does not draw the same conclusion. While defendants' counsel and Luxemburg disagreed repeatedly during the deposition about the nature of the questions asked of Luxemburg, there is every indication that Luxemburg tried to

answer the questions and ultimately was unequivocal in his
opinion about the cause of the accident.  The "deceitful and
annoying" behavior defendants point to, when read in context,
actually reflects efforts to answer the various questions put to
Luxemburg at his deposition, including his attempts to understand
the phrasing of certain questions and to avoid answering
questions without having a basis for doing so.

     In the example characterized by defendants as the "most
outrageous," Luxemburg stated that it was possible for an
elevator traveling at seven hundred feet per minute to crash into
the buffer at the bottom of the shaft and sustain no interior
damage.  He then explained that he had seen a number of elevators
traveling at much higher speeds crash into their buffers without
sustaining any interior damage.  (*Id.* at Ex. C, pp. 213-15).
This is a reasonable explanation for why he believes a lower-
speed accident might not damage an elevator car, especially in
the absence of evidence countering the veracity of his earlier
observations.

     Luxemburg's reasoning and methodology are drawn from the
facts of the case and his expertise gained from thirty years of
testing, designing, and inspecting elevators.  His reasoning has
led him to have an opinion as to the cause of the accident which
can be presented at trial and contrasted with the defendants'

18

proffered explanation.  His testimony is therefore relevant to aiding the finder of fact in this instance.  *See* FED. R. EVID. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

The preponderance of evidence presented by the plaintiffs is sufficient to admit Luxemburg's testimony as an expert in this case.

**C.  Defendants' "Subsequent Measures" Claim**

Defendants allege that Luxemburg's proposed testimony about repairs performed on the elevator's brake system should be excluded as testimony about a subsequent remedial measure.

The admissibility of subsequent remedial measures is addressed in Federal Rule of Evidence 407, which provides:

> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, had made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

FED. R. EVID. 407.  The Advisory Committee Notes explain that the primary justification for Rule 407 is the "social policy of

encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." FED. R. EVID. 407, Advisory Committee's Note.

Although Rule 407 prohibits the use of evidence of a defendant's subsequent remedial measures as proof of its negligence, the rule provides that evidence of such remedial measures may be admissible for certain purposes, including impeachment.   FED. R. EVID. 407.   Impeachment in this sense may include proving defendants' knowledge of the alleged dangerous condition at the time of the accident.   *Rozier v. Ford Motor Company*, 573 F.2d 1332, 1343 (5th Cir. 1978), *reh'g denied* 578 F.2d 871 (5th Cir. 1978); *Jones v. H.W.C. Ltd.*, 2003 WL 42146, *4-5 (E.D. La. 2003).

Plaintiffs respond that they wish to introduce evidence of repair work performed in May 2003 for impeachment purposes, as they believe that this evidence will controvert an anticipated claim by defendants that the brake pads which Luxemburg saw during his inspection of the elevator were the same pads that were on the elevator at the time of the accident.   Evidence of work performed on the brakes in May 2003, to the extent it tends to show that the pads may have been changed after the accident and before Luxemburg's inspection, is clearly admissible for this purpose.

**III. CONCLUSION**

For the reasons cited above, the Court does not find it appropriate to strike or exclude the proposed testimony of the plaintiffs' expert witnesses.  Consequently, defendants' motions are DENIED.


New Orleans, Louisiana, this 21st day of February, 2006.


SARAH S. VANCE
UNITED STATES DISTRICT JUDGE